USDC SCAN INDEX SHEET











USA

KULIK

CAG

3:97-M -00264

*1*

*CRCMP.*

**Affidavit in Lieu of Complaint**

FILED

JAN 27 1997

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
DEPUTY

97-0264M

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

Magistrate Docket No.
Case No. _Carpenter_

The accused ___DAVID KULIK___, now presented before
(the John) _James Stiven_, United States Magistrate Judge, for

arraignment and fixing of bail, has been charged before a United

States Magistrate Judge in the ___Central___ District of

___California___ at ___Los Angeles, CA___, on _January 15, 1997_, with the offense that on or about _a date unknown and_

**(Offense date)**
continuing to or on about January 15, 1997,
at _Los Angeles County_ in violation of United States Code,
**(Place of offense)**
                    and Title 18 USC 1956(h)
Title _21_, Section(s) _846_, the accused _DAVID KULIK_

_conspired to distribute hashish, a schedule I controlled_
**(Brief statement of offense charged)**
_substance and conspired to launder monetary_
_instruments_

and a warrant for his arrest was issued on _January 15, 1997_

    Bond in the sum of ___NONE___ has been recommended by an

Assistant United States Attorney in the district in which the

charges are pending.

    DATED: ___1/27/97___

_____
**Affiant**

_s/a D.E.A._
**Title**

Lodged with me this _27th_ day of _Jan_, 19 _97_,

in lieu of certified copy of complaint against the accused.

___James F. Stiven___

**United States Magistrate Judge**

YES/res/cab 062292

*1*

# United States District Court

### CENTRAL __ DISTRICT OF __ CALIFORNIA

UNITED STATES OF AMERICA
.V.
SEE ATTACHMENT

DAVID KULIK
(see attachment for alias')

**WARRANT FOR ARREST**
OR COMPLAINT

CASE NUMBER: **97-0079M-1**

To: The United States Marshal or any
Authorized United States Officer

YOU ARE HEREBY COMMANDED to arrest   SEE ATTACHMENT

_____
Name

and bring him or her forthwith to the nearest Judge/Magistrate to answer a complaint

charging him or her with (brief description of offense)

FOR VIOLATIONS OF TITLE 21, UNITED STATES CODE, SECTION 846, CONSPIRACY TO DISTRIBUTE
HASHISH, A SCHEDULE I CONTROLLED SUBSTANCE & FOR VIOLATIONS OF TITLE 18
UNITED STATES CODE, SECTION 1956(h), CONSPIRACY TO LAUNDER MONETARY INSTRUMENT.

in violation of Title 21     United States Code, Section(s) 846
in violation of Title 18     United States Code, Section 1956(h)

with Bail fixed at $ _____

REC: AUSA REBECCA LONERGAN

Date: January 15, 1997

_____
Name of Judge/Magistrate

_____
Signature of Judge/Magistrate

**RETURN**

This warrant was received and executed with the arrest of the above-named defendant at _____

| DATE RECEIVED | NAME AND TITLE OF ARRESTING OFFICER | SIGNATURE OF ARRESTING OFFICER |
|---|---|---|
| DATE OF ARREST | | |

AO 91
Rev. 11/82

**ORIGINAL**

# CRIMINAL COMPLAINT

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v. | Docket No. **97-0079M** |
| DAVID KULIK, aka JEFFREY,<br>aka COLIN ALLAN WALLS, aka<br>JEFFREY STEIN, aka JOHN ADAMS<br>aka DAVIDNANDA, aka DAVID<br>HOROWITZ, aka DANIEL FARRAR, aka<br>DAVID KAULIK, aka DANIEL KULIK,<br>aka DAVID NANDA, aka JEFFREY<br>JAMES, aka JEFFREY COLIN, aka<br>DAVID KUILIK, aka DAVID WILLIAMS,<br>aka DAVID KULICK, aka SEP, aka DAN<br>WILLS;<br>GARY MATSUZAKI, aka JERRY;<br>WANDA MARIE HALPERT, aka KRIS<br>aka ELIZABETH;<br>DOUGLAS MARTIN SECOR, aka ROB;<br>BRIAN ALAN AUCHARD, aka ROB, aka BOB<br>and<br>CHARLES STAUNTON, aka SAL, aka<br>CHARLIE. | MAGISTRATE'S CASE NO.<br><br>CR 97-<br><br> |

Complaint for violation of Title 18_, United States Code § 1956(h) and a violation of Title 21_, United States Code § 846.

| NAME OF MAGISTRATE JUDGE<br>~~Andrew J. Wistrich~~ James W. McMahon | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|
| DATE OF OFFENSE<br>Continuing to<br>Jan. 15, 1997 | PLACE OF OFFENSE<br>Los Angeles County<br>and elsewhere | Address of ACCUSED (IF KNOWN)<br>Unknown |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:
See Attachment A

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that<br>the foregoing is true and correct<br>to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>Jeffrey Todd Scott |
|---|---|
| | OFFICIAL TITLE, Special Agent<br>Drug Enforcement Administration |

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>January 15, 19 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.
AUSA-RSL/ss          REC: Detention All Defendants

## ATTACHMENT A

### Count One

Beginning on a date unknown and continuing to on or about January 15, 1997, in Los Angeles County, and within the Central District of California and elsewhere, defendants DAVID KULIK (aka JEFFREY, aka COLIN ALLAN WALLS, aka JEFFREY STEIN, aka JOHN ADAMS aka DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL FARRAR, aka DAVID KAULIK, aka DANIEL KULIK, aka DAVID NANDA, aka JEFFREY JAMES, aka JEFFREY COLIN, aka DAVID KUILIK, aka DAVID WILLIAMS, aka DAVID KULICK, aka SEP, aka DAN WILLS), GARY MATSUZAKI (aka JERRY), WANDA MARIE HALPERT (aka KRIS, aka ELIZABETH), DOUGLAS MARTIN SECOR (aka ROB), and BRIAN ALAN AUCHARD (aka ROB, aka BOB) and others, known and unknown, willfully and knowingly conspired and agreed with each other to commit offenses against the United States, namely: to knowingly and intentionally distribute hashish, a Schedule I Controlled Substance in violation of Title 21, United States Code, Section 841(a)(1).

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and other co-conspirators committed various overt acts within the Central District of California and elsewhere, including but not limited to the following: (1) on or about July 13, 1996, defendant GARY MATSUZAKI met with an undercover law enforcement agent to view a boat that would be used to transport hashish.

### Count Two

Beginning on a date unknown and continuing to on or about January 15, 1997, in San Bernardino County, and within the Central District of California and elsewhere, defendants DAVID KULIK (aka JEFFREY, aka COLLIN ALLAN WALLS, aka JEFFREY STEIN, aka JOHN ADAMS aka DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL FARRAR, aka DAVID KAULIK, aka DANIEL KULIK, aka DAVID NANDA, aka JEFFREY JAMES, aka JEFFREY COLIN, aka DAVID KUILIK, aka DAVID WILLIAMS, aka DAVID KULICK, aka SEP, aka DAN WILLS), BRIAN ALAN AUCHARD (aka ROB, aka BOB), CHARLES STAUNTON (aka SAL, aka CHARLIE) and others, known and unknown, willfully and knowingly conspired and agreed with each other to commit offenses against the United States, namely: to knowingly and intentionally launder monetary instruments in violation of Title 18, United States Code, Section 1956(h).

In furtherance of the conspiracy and to accomplish the objects of the conspiracy, defendant and and other co-conspirators committed various overt acts within the Central District of California and elsewhere, including but not limited to the following: (1) on or about September 30, 1996, defendant DAVID KULIK spoke with a confidential informant who was located within the Central District of California and directed the informant to go to Montreal, Canada to meet with a co-conspirator to pick-up money which would be used to pay for the transportation of hashish.

1    AFFIDAVIT IN SUPPORT OF APPLICATION

2    I, Jeffrey Todd Scott, being duly sworn, declare and state:

3    1.   I am a Special Agent (S/A) with the Drug Enforcement

4    Administration (DEA), and have been so employed for over one (1)

5    year.  I have been assigned to investigate large-scale narcotics

6    trafficking organizations as a member of the Los Angeles Field

7    Division (LAFD), Enforcement Group 2, since November 27, 1995.

8    2.   During my employment with the DEA, I have participated in

9    over twelve (12) narcotics investigations, including physical

10   surveillance, execution of search warrants, and arrests of numerous

11   drug traffickers.  I also have spoken on numerous occasions with

12   informants, suspects, and other experienced narcotics investigators

13   concerning the methods and practices of drug traffickers.  I have

14   attended specialized training courses on drug distribution, money

15   laundering, undercover investigations, and wiretaps.  I have been

16   involved in this investigation and related investigations since

17   April, 1996, and I am familiar with the facts and circumstances

18   described herein.  Through the course of this investigation, I have

19   become aware of the facts described below, as well as others which I

20   have not included in this affidavit.  I believe that probable cause

21   to arrest the subjects identified below exists based on the facts

22   set forth herein.

23   3.   This affidavit is made in support of a complaint and

24   warrant for the arrest of DAVID KULIK, also known as (aka)

25   "JEFFREY", aka COLIN ALLAN WALLS, aka JEFFREY STEIN, aka JOHN ADAMS,

26   aka DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL FARRAR, aka DAVID

27   KAULIK, aka DANIEL KULIK, aka DAVID NANDA, aka JEFFREY JAMES, aka

28   JEFFREY COLIN, aka DAVID KUILIK, aka DAVID WILLIAMS, aka DAVID

1

1  KULICK, aka "SEP", aka DAN WILLS; GARY MATSUZAKI, aka "JERRY"; WANDA

2  MARIE HALPERT, aka "KRIS", aka "ELIZABETH"; DOUGLAS MARTIN SECOR, aka

3  "ROB"; and BRIAN ALAN AUCHARD, aka "ROB", aka "BOB", for a violation

4  of Title 21, United States Code, Section 846, Conspiracy to

5  Distribute Hashish, a Schedule I Controlled Substance.

6       4.    This affidavit is also made in support of a complaint and

7  warrant for the arrest of DAVID KULIK, also known as (aka)

8  "JEFFREY", aka COLIN ALLAN WALLS, aka JEFFREY STEIN, aka JOHN ADAMS,

9  aka DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL FARRAR, aka DAVID

10  KAULIK, aka DANIEL KULIK, aka DAVID NANDA, aka JEFFREY JAMES, aka

11  JEFFREY COLIN, aka DAVID KUILIK, aka DAVID WILLIAMS, aka DAVID

12  KULICK, aka "SEP", aka DAN WILLS; BRIAN ALAN AUCHARD, aka "ROB", aka

13  "BOB"; and CHARLES STAUNTON, aka "SAL", aka "CHARLIE", for a violation

14  of Title 18, United States Code, Section 1956(h), conspiracy to

15  launder monetary instruments.

16       5.    In April of 1996, I was contacted by DEA S/A's Sithik Sar

17  and Steve Smith.  Through my review of DEA investigative records

18  regarding S/A Sar's investigation and conversations with S/A Sar, I

19  learned the following:

20            a.    From January 3, 1996 to February 8, 1996, S/A's

21  Sithik Sar, Brian Lee, and Steve Smith debriefed a Confidential

22  Source (CS) by telephone and in person regarding the drug

23  trafficking activities of KULIK.

24            (1)  The CS is an associate of KULIK's who was

25  formerly involved in KULIK's drug trafficking activities.  The CS is

26  and has been employed by Ground Control Studios in Burbank,

27  California, a recording studio in which KULIK and his family have an

28  interest.  In connection with his/her criminal involvement with

                                    2

1 | KULIK, on September 30, 1982, the CS was convicted of possession for

2 | the purpose of trafficking eight pounds of hashish oil in Canada,

3 | and was sentenced to 30 months imprisonment.

4 |         (2)   The CS has thus far proven to be reliable in

5 | that s/he has provided information which has been corroborated by

6 | investigative records and consensually recorded tapes.

7 |         (3)   The CS is cooperating with the DEA to help DEA

8 | build a prosecutable case against KULIK and in the hope that s/he

9 | will be financially rewarded.

10 |       b.   During these meetings with S/A's Sar, Lee, and Smith,

11 | the CS disclosed the following:

12 |         (1)   The CS had recently spoken with KULIK by

13 | telephone on several occasions, during which KULIK informed the CS

14 | that KULIK wanted the CS to assist him in collecting $60 million

15 | (USD) currently in Australia which belonged to KULIK from a prior

16 | hashish transaction.   The CS agreed to assist KULIK in collecting

17 | the money.

18 |         (2)   On January 13, 1996, KULIK telephoned the CS and

19 | asked the CS to travel to Bali, Indonesia, where KULIK lives, to

20 | meet with KULIK and discuss the above referenced money collection

21 | and a proposed multi-ton hashish shipment.

22 |       c.   Pursuant to KULIK's request, on February 12, 1996,

23 | the CS arrived in Indonesia to meet with KULIK.   DEA agents and the

24 | Indonesian National Police (INP) maintained surveillance of the CS,

25 | and observed the CS meet with a white male later identified as

26 | KULIK.   KULIK transported the CS to a bungalow compound in Bali,

27 | Indonesia.

28 |       d.   On February 14, 1996, while in Indonesia, DEA Country

1  Attache (CA) Larry Hahn and DEA S/A Dennis Barton debriefed the CS
2  regarding his/her meetings with KULIK, and the CS disclosed the
3  following:
4            (1)   KULIK was planning a multi-ton hashish smuggling
5  venture to Australia, and that KULIK already had a boat and a source
6  of supply.
7            (2)   KULIK reiterated that he is still owed about $60
8  million (USD) by an Australian related to an earlier hashish
9  shipment.
10  6.   I have reviewed law enforcement records which disclose
11  prior criminal convictions in the United States.  Those records show
12  that KULIK was convicted in 1980 of conspiracy to illegally import a
13  controlled substance.
14  7.   On April 29, 1996, S/A Christopher Sclichter, Group
15  Supervisor (GS) Anthony J. Coulson, and I debriefed the CS, who
16  revealed the following:
17            a.   Between February, 1996 and April, 1996, the CS
18  continued to have contact with KULIK.
19            b.   On April 27, 1996, KULIK called the CS to say that he
20  (KULIK) was coordinating a multi-ton hashish load into western
21  Canada via ocean-going vessel.  KULIK had contacts in Canada to
22  distribute the hashish, but KULIK needed the CS to arrange for an
23  off-shore, boat-to-boat, exchange of the hashish approximately 500
24  to 1000 miles out to sea.
25  8.   On May 2, 1996, S/A Sclichter, GS Coulson, and I spoke
26  with the CS, who disclosed the following:
27            a.   KULIK had called the CS the previous night, May 1,
28  1996, and asked the CS to check his (KULIK'S) voicemail.  KULIK also

4

1  asked the CS to contact WANDA HALPERT, a Canadian citizen and
2  resident whom KULIK wanted to distribute a possible load of hashish.

3         b.   The CS attempted to reach HALPERT by phone, but
4  HALPERT refused to speak to the CS concerning KULIK and asked not to
5  be contacted again.

6      9.   On May 9, 1996, S/A Sclichter and I spoke with the CS, who
7  told us that following:

8         a.   KULIK had contacted the CS on the evening of May 8,
9  1996, and told the CS that KULIK wanted the CS to try to retrieve
10 the money in Australia as quickly as possible because this money
11 would be used facilitate the proposed hashish transaction.   KULIK
12 also told the CS that he had attempted to contact HALPERT, but she
13 also refused to talk with him.   KULIK stated that he would provide
14 additional names and numbers for possible distributors within a few
15 days.

16     10.  On May 21, 1996, S/A Sclichter and I spoke with the CS,
17 who told us the following:

18         a.   KULIK had called the CS on May 20, 1996, and told the
19 CS that it was imperative that s/he move quickly to retrieve the
20 money in Australia, and should travel there immediately.   KULIK said
21 that whomever the CS contracted to handle the off-shore pickup of
22 the hashish should be prepared to come to Bali, Indonesia, prior to
23 the shipment.   The size of the shipment had increased from 10 tons
24 to 25 tons.   KULIK also had arranged a contact in Montreal to take
25 delivery of the hashish.

26     11.  On June 6, 1996, S/A Sclichter and I spoke with the CS,
27 who told us that the CS had received a four (4) page facsimile that
28 day from KULIK.   The CS gave us the facsimile.   This facsimile

                                5

1 │ contained the specifications required of the off-load ship, and was

2 │ sent to the CS from Geneva, Switzerland.

3 │     12.  On June 9, 1996, S/A Sclichter and I met with the CS, who

4 │ provided us with $2,000 (USD), which the CS told us s/he had

5 │ received from KULIK that day.  The CS further informed us that KULIK

6 │ had instructed the CS to use the money to travel to Geneva,

7 │ Switzerland, so that the CS and KULIK could meet to discuss the

8 │ proposed hashish shipment.

9 │     13.  On June 10, 1996, S/A Sclichter, the CS, and I flew to

10 │ Geneva, Switzerland, where we were joined by DEA S/A Steven Austin,

11 │ who was to act in an undercover capacity as the captain of the

12 │ proposed off-load ship.  I learned the following information through

13 │ surveillance of the CS, S/A Austin, and KULIK, and through

14 │ subsequent conversations with the CS and S/A Austin.

15 │         a.   On June 13, 1996, the CS and S/A Austin met with

16 │ KULIK in the lobby of the Noga Hilton, Geneva, Switzerland. During

17 │ the day, S/A Austin and KULIK met several times to discuss the

18 │ transportation and off-load of a multi-ton quantity of hash.  S/A

19 │ Austin suggested to KULIK that he (S/A Austin) would use a

20 │ commercial tug and barge to handle the off-load, and the total down

21 │ payment fee would need to be approximately $250,000 (USD).

22 │         b.   KULIK introduced an individual named "JERRY" (later

23 │ identified as GARY MATSUZAKI) to the CS and S/A Austin.

24 │         c.   MATSUZAKI and S/A Austin spoke several times about

25 │ the proposed hashish shipment.  MATSUZAKI asked S/A Austin if

26 │ MATSUZAKI could see the tug and barge proposed for use in the at-sea

27 │ transfer, which S/A Austin said he could.

28 │         d.   KULIK and MATSUZAKI gave the CS a voicemail number

6

1    and access code, and instructed the CS to telephone the voicemail

2    twice a day to retrieve messages from KULIK and MATSUZAKI.

3              e.    MATSUZAKI gave the CS $500.00 (USD), and instructed

4    the CS to purchase a cellular telephone once the CS arrived back in

5    the United States so that KULIK and MATSUZAKI could easily contact

6    the CS.

7              (1)   Following that meeting, the CS turned the $500

8    over to S/A Sclichter and me, and S/A Sclichter and I obtained a

9    cellular telephone for the CS to use pursuant to KULIK's

10   instructions.

11       14.   I reviewed a report prepared by S/A Sclichter, which

12   revealed that on July 12, 1996, MATSUZAKI telephoned the CS and told

13   the CS that MATSUZAKI would be arriving in Los Angeles the next day.

14   MATSUZAKI told the CS that he expected S/A Austin to pick him up at

15   the airport.

16       15.   I reviewed a report prepared by S/A Sclichter, which

17   revealed that on July 13, 1996, S/A Sclichter and other agents,

18   conducting surveillance, observed S/A Austin pick up MATSUZAKI at

19   the airport and drive him to Foss Maritime in Long Beach, where they

20   viewed the tugboat "Pacific Mariner."  S/A Austin then drove

21   MATSUZAKI to a hotel in Long Beach.  Hotel records obtained by DEA

22   S/A Stephen Burke show that MATSUZAKI checked into the hotel under

23   the name GARY MATSUZAKI and used the address of 15021 Bodger,

24   Hawthorne, California.

25       16.   I reviewed the report prepared by S/A Austin regarding his

26   meeting with MATSUZAKI on July 13, 1996, and it revealed the

27   following:

28              a.    MATSUZAKI stated that the mothership was 210' in

                                      7

1   length, and that the crew were professional Filipino seamen.

2   MATSUZAKI stated that the off-load was still 30 or 40 days away at

3   the earliest.

4          b.    MATSUZAKI provided S/A Austin with the same voicemail

5   provided to the CS in Geneva, Switzerland, and instructed S/A Austin

6   to check it for messages.

7          c.    MATSUZAKI stated that "JEFFREY" (referring to KULIK)

8   worked for him, rather than the other way around.

9          d.    S/A Austin told MATSUZAKI that "Kenny" (referring to

10  DEA Group Supervisor (G/S) Kenneth Davis, acting in an undercover

11  capacity) is the boat broker for whom S/A Austin works, and that

12  Kenny would arrange for legitimate cargo manifests for importation

13  of the hashish.

14      17.   I reviewed a report prepared by S/A Sclichter, which

15  revealed the following:

16         a.    On July 23, 1996, S/A Sclichter spoke with the CS,

17  who told him that on July 20, 1996, KULIK called the CS and told the

18  CS that he (KULIK) was in Bali, Indonesia, and he wanted the CS to

19  travel there within the next two or three weeks.  KULIK asked the CS

20  to firm up his/her contacts with Canadian customs in Vancouver and

21  to call KULIK with the details.  KULIK also told the CS that

22  MATSUZAKI was pleased with the July 13, 1996 meeting which he had

23  with S/A Austin.  KULIK said that he also wanted the CS to write a

24  letter to HALPERT and tell HALPERT that KULIK wanted her to meet

25  with the CS.  KULIK also told the CS to give HALPERT KULIK'S

26  voicemail number.

27         b.    On July 25, 1996, S/A Sclichter spoke with the CS,

28  who told him that on July 24, 1996, KULIK telephoned the CS and told

8

1   the CS that the "camera is loaded," but that there was a "problem

2   with packaging" that will be corrected and will delay departure for

3   two (2) weeks.

4              (1)   Based upon my training and experience, I

5   understand that narcotics traffickers prefer to use codes when

6   communicating about drugs because it disguises the true nature of

7   their discussions.   I believe that the phrases "the camera is

8   loaded" and "problem with packaging" refer to the status of the

9   mothership and its load of hashish.

10              c.   On July 26, 1996, S/A Sclichter spoke with the CS,

11   who told him that on July 25, 1996, KULIK telephoned the CS and told

12   the CS that KULIK's mother, Katherine Kulik, would write the letter

13   to HALPERT.   KULIK asked if the CS could obtain false U.S.

14   passports.

15       18.   I reviewed a report prepared by S/A Sclichter on August 8,

16   1996, which revealed the following:

17              a.   On August 5, 1996, he spoke with the CS, who told him

18   that on August 2, 1996, KULIK telephoned the CS and told the CS that

19   HALPERT had everything ready in Canada, and the CS should travel to

20   Vancouver within the next seven to ten days to meet with HALPERT.

21   KULIK also told the CS that the load should be leaving in

22   approximately one week, when the weather has cleared.

23              b.   On or about August 8, 1996, S/A Sclichter spoke with

24   the CS, who told him that on August 7, 1996, KULIK called the CS and

25   told the CS that HALPERT would arrange for a place in Vancouver to

26   off-load the hashish.

27       19.   I reviewed a report prepared by S/A Sclichter on August

28   22, 1996, and learned the following:

9

1        a.   On August 9, 1996, S/A Sclichter spoke with the CS,

2   who told him that KULIK had called the CS and told the CS that the

3   vessel was underway.   KULIK also said that MATSUZAKI wanted to have

4   another meeting with the CS and S/A Steve Austin in Bali, Indonesia.

5        b.   On August 15, 1996, S/A Sclichter spoke with the CS,

6   who told him that KULIK telephoned the CS on August 14, 1996, and

7   they discussed whether the CS would travel into Canada to meet with

8   HALPERT.   The CS told KULIK that s/he would meet with HALPERT on the

9   United States side of the border.

10       20.   On August 22, 1996, S/A Sclichter and I spoke with the CS,

11  who told us that on August 21, 1996, the CS had received a second

12  phone call from KULIK, during which KULIK stated that HALPERT was

13  ready to work.   KULIK also said that he still wanted to meet with

14  S/A Austin in Bali, Indonesia, to discuss the communications plan

15  between the mothership and the off-load vessel.

16       21.   On August 22, 1996, S/A's Sclichter, Sharpe, and I

17  observed the CS telephone HALPERT and tell HALPERT to contact KULIK.

18  The CS also told her that the CS would meet her the following week

19  at a place "south" of her home in Vancouver.

20       22.   On August 26, 1996, S/A Sclichter and I met with the CS,

21  who told us that KULIK telephoned the CS very early that morning and

22  said that he believed the mothership containing the hashish load had

23  sailed from Pakistan two or three days before.   KULIK reiterated his

24  desire to speak with S/A Austin because S/A Austin had extensive

25  information concerning the ship-to-ship communications.   KULIK said

26  that his shipment "back East" had gone well and that he was

27  receiving money from that shipment.

28       23.   On September 10, 1996, S/A's Sclichter and Sharpe, GS

10

1   Coulson, and I spoke with the CS, who told us that on September 9,

2   1996, KULIK telephoned the CS and said that everything was

3   progressing well and that KULIK had "100%" confirmation that the

4   mothership had left its port.

5        24.   On September 10, 1996, S/A's Sclichter, Sharpe, and I

6   observed the CS telephone HALPERT and make arrangements for them to

7   meet in Seattle, Washington on or about Friday, September 13, 1996.

8   The CS then telephoned KULIK's voicemail box and left a message for

9   KULIK to call the CS soon.

10       25.   On or about September 11, 1996, S/A's Sclichter and

11  Sharpe; GS Coulson, and I spoke with the CS, who told us that KULIK

12  telephoned the CS that day and asked the CS to reassure S/A Austin

13  that the mothership had left and that he (KULIK) was doing his best

14  to get the down payment money to S/A Austin.

15       26.   On September 13, 1996, I and other DEA agents conducted

16  surveillance of a meeting between the CS and a white female

17  identified as WANDA HALPERT in Seattle, Washington.  That day, S/A

18  Sclichter and I spoke with the CS, who told us the following about

19  the meeting with HALPERT:

20            a.   HALPERT questioned the CS at length regarding the

21  size and type of containers in which the hashish would be loaded.

22  HALPERT stated her expectation that she would have to arrange the

23  off-load of the mothership as well as the distribution of hashish,

24  but the CS informed HALPERT that she only had to handle

25  distribution.  HALPERT stated that she was willing to handle the

26  exchange of money, if necessary.  HALPERT said that she intended to

27  store the hashish primarily in Vancouver, and then ship it to other

28  parts of Canada.

11

1        b.   HALPERT refused to meet with G/S Kenneth Davis, who

2  had traveled to Seattle to meet HALPERT, but acknowledged that at

3  some point she would have to meet him.

4        27.  I reviewed a report prepared by S/A Sharpe regarding his

5  telephone conversation with the CS on September 19, 1996, during

6  which the CS disclosed the following:

7        a.   On September 18, 1996, KULIK telephoned the CS and

8  said that he and his partners had to drop a load of hashish in

9  Australia before they could proceed to the west coast of North

10  America.  KULIK stated that the load destined for Canada should be

11  off the coast of North America on or about October 20, 1996.

12        28.  On September 23, 1996, I spoke with the CS, who told me

13  that on September 22, 1996, KULIK had left a message on the CS's

14  voicemail requesting that the CS travel to Bali, Indonesia to

15  receive some of the down payment money.

16        29.  On September 25, 1996, I spoke with the CS, who told me

17  the following:

18        a.   KULIK telephoned the CS that day and asked if the

19  CS's contacts (referring to S/A Austin or G/S Davis) could stage the

20  off-load ship in the area around Hawaii.  KULIK stated that the

21  mothership would be making its first drop-off in ten days, and KULIK

22  reiterated that he wanted the CS to travel to Bali, Indonesia.

23  KULIK also said that his deal in the "east" had gone well and that

24  the CS could travel to Montreal to pick up a down payment in the

25  amount of $250,000 (USD).

26        30.  On or about September 28, 1996, I spoke with S/A

27  Sclichter, who told me that on that day, he had spoken with G/S

28  Davis.  G/S Davis told him that he and the CS spoke by telephone

12

1  with KULIK about the hashish transaction.  During this conversation,

2  KULIK instructed G/S Davis to obtain a cellular telephone through

3  which KULIK could communicate directly with him.

4      31.  On October 1, 1996, S/A's Sclichter, Sharpe, and I spoke

5  with the CS, who told us that KULIK had telephoned the CS the night

6  before at the CS's home in the Central District of California, and

7  said that the down payment amount, previously $250,000 (USD), was

8  going to be increased to $280,000 (USD).  KULIK informed the CS that

9  the money was to be divided in the following way: $20,000 (Canadian)

10  to WANDA HALPERT, $10,000 (USD) (and a fake passport) to "JERRY"

11  (MATSUZAKI), and the balance to transportation costs.  KULIK was

12  going to give the CS details about where and when to pick up the

13  down payment in Montreal, Canada by the next day.  KULIK also said

14  that HALPERT would not be coming to any proposed meeting in Bali,

15  Indonesia.

16      32.  On October 6, 1996, S/A Sclichter, G/S Davis, and I

17  traveled with the CS to Montreal, Canada.  The following information

18  I learned either through conversations with other agents and/or the

19  CS, and my own personal observations.

20          a.  On October 7, 1996, KULIK telephoned the CS and

21  instructed the CS to meet with an unknown male at 1:00 p.m. that

22  afternoon at the Le Centre Sheraton, Montreal, Canada.  At that

23  meeting, the CS would receive a sum of Canadian currency equal to

24  $280,000 (USD).  KULIK reiterated that the money was to be split

25  between WANDA HALPERT, MATSUZAKI, and transportation fees.  KULIK

26  also told the CS that the mothership had two "burned out" generators

27  and was currently in dock.  As a result, the overall operation would

28  be delayed and KULIK did not want the CS to give G/S Davis the down

13

1  payment until further notice.

2       b.   On October 7, 1996, at approximately 1:00 p.m., the

3  CS and G/S Davis met with an unknown white male identified as "Sal"

4  or "Charlie" (later identified as CHARLES STAUNTON) at the Le Centre

5  Sheraton in Montreal, Canada.   STAUNTON was seated at a table in the

6  lobby of the hotel when the CS and G/S Davis arrived, and motioned

7  to them to join him.   STAUNTON introduced himself as "Sal," and

8  checked the serial numbers of a $100 bill given to him by the CS,

9  which was a predetermined signal.   STAUNTON told the CS that he had

10  been given the money in all 20 dollar bills (Canadian) and he

11  exchanged them for 100 dollar bills (Canadian).   STAUNTON also said

12  that he had been instructed to give the CS and G/S Davis the

13  equivalent of $280,000 (USD) and to get the best exchange rate,

14  which that day was $381,000 (Canadian).   STAUNTON said that it was

15  actually $380,900 (Canadian), but he rounded it up to $381,000

16  (Canadian).   STAUNTON said that the bundles of money being given to

17  the CS and G/S Davis were $10,000 each.   STAUNTON handed the CS a

18  small flight bag that was later found to contain approximately

19  $381,000 in Canadian currency ($277,259.40 (USD)).

20       (1)   Steven LeBlanc and Pierre LeBlond of the RCMP

21  later told me that the RCMP conducted surveillance of STAUNTON

22  following his meeting with the CS and G/S Davis.   The RCMP observed

23  STAUNTON leave the location where he had met with the CS and G/S

24  Davis, and go directly to a restaurant where STAUNTON met with

25  another male, later identified as BRIAN AUCHARD.   AUCHARD is a U.S.

26  resident and native of California.

27       (2)   I have received information from the Australian

28  Federal Police indicating that STAUNTON is a former Australian

14

1  Federal Police officer, and was convicted of perjury in Australia in

2  1995.

3      33.  On October 28, 1996, I spoke with S/A Schlichter, who told

4  me the following:

5          a.  On or about October 9 or 10, 1996, S/A Slichter

6  spoke with the CS, who told him the CS had spoken with KULIK and

7  told KULIK that the CS and G/S Davis would travel to Bali to meet

8  with KULIK, and would arrive on October 17, 1996.

9          b.  On October 14, 1996, the CS, G/S Davis, G/S Coulson,

10  and S/A Slichter traveled to Bali and arrived in Bali on different

11  flights on October 16 and 17, 1996.

12          c.  While in Bali, S/A Slichter conducted surveillance

13  of the CS and G/S Davis' meetings with KULIK and MATSUZAKI, and

14  spoke with both the CS and G/S Davis on numerous occasions.  Based

15  thereon, S/A Slichter learned the following:

16          (1)  The CS and G/S Davis met with KULIK every day

17  from October 17 to 22, 1996.  MATSUZAKI came to Bali on October 20,

18  1996, at which time he began meeting with KULIK, the CS, and G/S

19  Davis.  During these meetings, KULIK and MATSUZAKI discussed the

20  impending hashish transaction, and agreed, among other things, that

21  after the off-load ship took possession of the hashish at sea, the

22  hashish would be transported to Long Beach, California, and then

23  transported by truck to Montreal, Canada and stored in a warehouse

24  to be rented by G/S Davis under a fictitious name.

25          d.  KULIK also asked the CS to make arrangements for

26  someone to make specific bags for KULIK's use in covertly

27  transporting and laundering money.

28      34.  On or about October 24, 1996, G/S Coulson and I spoke with

15

1  Australian Liaison Officer (LO) Shane Castles, who told us the most

2  recent information from the Australian Federal Police's (AFP)

3  continuing investigation into a suspected hashish trafficking group

4  in Queensland, Australia.  Based on the information known by the AFP

5  and DEA, it was concluded that the two investigations involved the

6  same overall smuggling venture.  The AFP investigation centered on

7  the S/V "Highlander", a sailing vessel registered in Seattle,

8  Washington docked in Queensland, Australia, and the AFP expected

9  that the Highlander would receive a multi-ton quantity of hashish

10  from the same mothership from which the DEA expected to receive

11  hashish.

12        35.  On October 25, 1996, I spoke with S/A Sclichter, who told

13  me the following:

14            a.   S/A Sclichter had spoken with the CS, who told him

15  the following:

16              (1)  KULIK telephoned the CS on October 24, 1996, and

17  KULIK stressed the importance of making the bags for transporting

18  money, and told the CS that the mothership was expected to be at an

19  identified location in one-to-two days.  When the mothership arrived

20  at that location, both the mothership and the off-load ship should

21  leave at the same time for the at-sea off-load meeting site.

22              (2)  KULIK telephoned the CS on the morning of

23  October 25, 1996, and told the CS that the mothership had left and

24  the off-load ship should leave immediately for Hawaii to prepare to

25  travel to the off-load site.

26            b.   S/A Sclichter had also spoken with G/S Davis, who

27  told him that KULIK and MATSUZAKI telephoned G/S Davis on October

28  25, 1996, and told G/S Davis that the mothership was on its way to

                                    16

1  meet with G/S Davis' ship.

2      36.  On October 29, 1996, I spoke with S/A Sclichter, who told

3  me that G/S Davis told him that KULIK had called G/S Davis that day,

4  during which KULIK told G/S Davis that the at-sea off-load may occur

5  at a different location.

6      37.  I reviewed a report prepared by S/A Daphne Morrison, which

7  revealed that on October, 29, 1996, she met with a white female

8  identified as WANDA HALPERT at a hotel near Los Angeles

9  International Airport (LAX).  During this meeting, S/A Morrison gave

10  approximately $14,268 (USD) to HALPERT.  This money had been

11  provided to DEA by STAUNTON on KULIK's behalf in Montreal, Canada on

12  October 7, 1996, and was given to HALPERT pursuant to KULIK's

13  instructions.

14      38.  I reviewed a report dated November 8, 1996, prepared by

15  G/S Davis, and learned the following:

16          a.  G/S Davis spoke with KULIK on numerous occasions

17  between October 31, 1996, and November 6, 1996.  During these

18  conversations, KULIK and G/S Davis discussed the fact that the

19  mothership was having numerous mechanical problems and was moving

20  slowly because of bad weather and high seas.  KULIK also told G/S

21  Davis that a back-up mothership was on its way to meet with the

22  mothership, and the two ships were having problems communicating

23  with each other.

24      39.  On or about November 15, 1996, I spoke with S/A Sclichter,

25  and he told me that he had spoken with TFO Miller, who told him the

26  following:

27          a.  On the morning of November 15, 1996, the CS, who was

28  in Montreal pursuant to a prior directive from KULIK, received a

17

1 telephone call from KULIK.  KULIK instructed the CS to meet that day

2 with the same person with whom he had met in Montreal to receive an

3 additional $80,000 (Canadian).  KULIK also instructed the CS to give

4 "Charlie" (STAUNTON) five black bags with hidden compartments which

5 the CS had made pursuant to KULIK's specifications.  KULIK further

6 instructed the CS that of the $80,000 (Canadian), $10,000 (USD) was

7 to be used to pay for manufacture of the black bags, and the rest to

8 pay for rental of the warehouse in Montreal.

9       b.   That afternoon, November 15, 1996, TFO Miller, acting

10 in an undercover capacity, and the CS met with STAUNTON in Montreal,

11 Canada.  STAUNTON gave the CS approximately $80,000 (Canadian).  TFO

12 Miller gave STAUNTON a large bag containing the five (5) black bags

13 with secret compartments to covertly transport money, made to

14 specifications provided by KULIK.  TFO Miller showed STAUNTON how to

15 open the black bags and reveal the secret compartments.

16    40.  I reviewed a report dated November 20, 1996, prepared by

17 S/A Kevin Sharpe, and learned the following:

18       a.   On November 15, 1996, after the meeting between the

19 CS and STAUNTON, KULIK telephoned the CS and instructed the CS to

20 deliver the bags for transporting money to the "bag man" in a

21 specific room at a different hotel.  The CS told KULIK that the CS

22 had already given the bags to STAUNTON, and KULIK agreed to make

23 arrangements himself for getting the bags to the "bag man."

24    41.  I spoke with TFO Miller, and he told me the following:

25       a.   On or about November 29, 1996, the CS spoke on the

26 telephone with KULIK.  KULIK informed the CS that HALPERT was in the

27 Los Angeles area, and wanted to meet with the CS so the CS could

28 assist her in making travel arrangements for a meeting with KULIK.

1            b.    On November 30, 1996, TFO Miller, acting in an
2    undercover capacity, met with HALPERT at a hotel near LAX.  During
3    this meeting, HALPERT told TFO Miller that HALPERT had established
4    six warehouses in Canada in which to store the hashish, and had
5    spent approximately $40,000 (Canadian) retaining the warehouses.
6            c.    On December 2, 1996, TFO Miller met again with
7    HALPERT and gave her a travel itinerary and airplane tickets to
8    Bangkok.
9        42.    I reviewed a report dated December 9, 1996, prepared by
10   S/A Sharpe, and learned the following:
11           a.    On December 5, 1996, KULIK telephoned the CS and told
12   the CS that KULIK and HALPERT were together in Bangkok.  KULIK
13   thought that HALPERT was being followed by the police, and advised
14   the CS to stop dealing with HALPERT and to stay away from the CS's
15   house and work to ensure that s/he is not being followed.
16       43.    From December 4, 1996 to December 12, 1996, G/S Coulson
17   and I were in regular contact with Australian LO Shane Castles,  and
18   learned that the AFP was continuing to monitor the activities of S/V
19   Highlander, and believed that the S/V Highlander had met with
20   another vessel at sea on or about December 2, 1996, for the purpose
21   of acquiring approximately 7.5 tons of hashish.  The AFP believed
22   that the S/V Highlander would return to a landing spot near Fraser
23   Island, Australia to off-load the hashish.
24       44.    I reviewed a report dated December 10, 1996, prepared by
25   S/A Sharpe, and learned the following:
26           a.    On December 8, 1996, the CS received a telephone call
27   from KULIK, who told the CS that the "bosses" wanted KULIK to stay
28   in Bangkok for another week or so.  KULIK instructed the CS to

                                19

1  contact him every night on KULIK's cellular telephone.  KULIK
2  informed the CS that the off-load was proceeding as planned.
3         b.    The CS informed KULIK that G/S Davis' had not heard
4  from "Jerry" (MATSUZAKI) in several days, and wanted to speak with
5  him.  KULIK told the CS that he would have MATSUZAKI contact G/S
6  Davis soon.
7     45.  On December 12, 1996, I spoke with G/S Coulson, who told
8  me that on the morning of December 12, 1996, the AFP seized the S/V
9  Highlander as it attempted to unload approximately eight tons of
10 hashish on the coast of Queensland, near Fraser Island, Australia.
11 Approximately 15 persons were arrested and three vessels seized.
12    46.  On December 12, 1996, I and several other DEA agents,
13 acting in an undercover capacity, were transported from a support
14 vessel onto the "Iver Foss," the tugboat retained by DEA for the
15 purpose of receiving a multi-ton quantity of hashish from the
16 mothership retained by KULIK and MATSUZAKI.  The Iver Foss was being
17 captained by G/S Davis and S/A Austin.  On an approximately 1,500
18 foot line, the Iver Foss was pulling an approximately 210 foot barge
19 carrying five empty sea containers and two other containers carrying
20 water and gasoline, which KULIK had instructed us to deliver to the
21 mothership.
22    47.  At approximately 7:30 p.m. on December 12, 1996, the Iver
23 Foss met with a motor vessel bearing the name "Cayenne" (later
24 identified as the "Unity Prayer") in the South Pacific ocean.  I and
25 the other agents were transferred to the barge being towed by the
26 Iver Foss.  Thereafter, nine unidentified Filipino or Asian males
27 began tossing burlap bags, or bundles, from the Cayenne/Unity Prayer
28 to the deck of the barge.  Approximately 773 bundles were

20

1   transferred to the barge, at a total estimated weight of 34,895

2   pounds (approximately 17.5 tons).  One bag was inadvertently thrown

3   by the Filipino males into the ocean.  The transfer of bags was

4   videotaped.  I observed S/A Sclichter secure the bags into the five

5   sea containers on the barge. Immediately after the transfer, the

6   Cayenne/Unity Prayer cut its lines away from the Iver Foss and

7   sailed to an unknown destination.  I and the other agents were

8   transferred to a support vessel, and S/A Austin and S/A Donny Garcia

9   stayed on the Iver Foss, which towed the barge back to Honolulu for

10  eventual storage of the off-loaded bundles at the United States

11  Customs Service in Terminal Island, California.

12      48.  On December 23, 1996, I spoke with Nathan Salazar of the

13  Southwest Regional Drug Laboratory.  Mr. Salazar told me that he had

14  examined the bundles at the Terminal Island facility, and there were

15  a total of 773 bundles weighing approximately 17.5 tons, and the

16  results of a presumptive tests of samples taken at random from the

17  bundles indicated that the bundles contained hashish.

18      49.  I reviewed a report dated December 13, 1996, prepared by

19  S/A Sharpe, and learned the following:

20          a.   On the morning of December 13, 1996, the CS received

21  a telephone call from KULIK, who told him the following:

22              (1)  A load in Australia had been seized by the

23  police and approximately 7 tons of hashish seized.  KULIK told the

24  CS that KULIK could not return to Bali, Indonesia, because numerous

25  persons involved with the Australia seizure knew of KULIK's

26  involvement in that transaction and had information about his

27  organization and connections.

28              (2)  KULIK instructed the CS not to tell G/S Davis of

                                    21

1 | the Australia seizure because it would make him nervous if he knew.

2 | KULIK informed the CS that if he called the CS and told the CS that

3 | "all the passengers should not go because Mister Ghandi does not

4 | like it anymore," the CS was to immediately contact G/S Davis and

5 | tell him to throw the hashish overboard.

6 |        (3)   KULIK further informed the CS that one of his

7 | "bosses" was in Australia and trying to leave the country that day

8 | (December 13, 1996).

9 |      b.   The CS had received a message on his/her home

10 | answering machine from "Jerry" (MATSUZAKI) on December 11, 1996,

11 | instructing the CS to call him and confirm for MATSUZAKI that G/S

12 | Davis was in communication with the mothership.

13 |     50.   Between December 13 and December 30, 1996, I remained in

14 | frequent communication with the CS and with G/S Davis.  They both

15 | told me that they had numerous telephone conversations with KULIK

16 | and MATSUZAKI about the hashish transaction and the progress of the

17 | tug and barge into Long Beach, California from Hawaii.

18 |     51.   On December 30, 1996, I spoke with the CS, and he told me

19 | the following:

20 |      a.   That day, pursuant to KULIK and MATSUZAKI's request,

21 | the CS traveled to Tijuana, Mexico for a meeting with KULIK and

22 | MATSUZAKI.  During this meeting, KULIK and MATSUZAKI discussed with

23 | the CS the status of the hashish transaction and expressed concerns

24 | to the CS about whether the CS thought that G/S Davis could be

25 | trusted.

26 |      b.   At this meeting, KULIK and MATSUZAKI introduced the

27 | CS to "ROB" or "BOB" (later identified as BRIAN AUCHARD).  AUCHARD

28 | was present during the entire meeting.  During that meeting, KULIK

22

1 and MATSUZAKI indicated to the CS that AUCHARD would deliver the

2 money to the CS for the final payment for the rented tug and barge.

3          c.    KULIK also gave the CS $5,500 in Canadian currency

4 and asked the CS to change it to U.S. dollars for him.  KULIK

5 instructed the CS to keep $500 for him/herself, and to give the rest

6 to AUCHARD when AUCHARD delivered money to the CS for the

7 transportation costs.

8          d.    After the meeting with KULIK, MATSUZAKI, and AUCHARD,

9 the CS saw STAUNTON in a parking lot in Tijuana, Mexico.

10     52.  On January 2, 1997, I and other DEA agents conducted

11 surveillance of a meeting between the CS and AUCHARD in a hotel near

12 LAX.  Through the surveillance and my conversations with the CS, I

13 learned that AUCHARD delivered approximately $150,000 (USD) to the

14 CS, and the CS gave approximately $3,494 (USD) to AUCHARD to give to

15 KULIK.

16     53.  On January 3, 1997, I and other DEA agents again conducted

17 surveillance of a meeting between the CS and AUCHARD in a hotel near

18 LAX.  Through the surveillance and my conversations with the CS, I

19 learned that AUCHARD delivered another approximately $150,000 (USD)

20 to the CS.

21     54.  On or about January 7, 1997, I spoke with G/S Davis, who

22 told me the following:

23          a.    On January 6, 1997, he and the CS traveled to

24 Tijuana, Mexico, for a meeting with KULIK and MATSUZAKI.  During

25 this meeting, KULIK and MATSUZAKI explained to G/S Davis and the CS

26 that they wanted two loads, approximately eight tons of hashish, to

27 be transported to Montreal, Canada for distribution there, and one

28 load, approximately four tons of hashish, to be delivered to Los

23

1   Angeles.

2   b.   At this meeting, G/S Davis discussed with KULIK and
3   MATSUZAKI the bill from the rental of the tug and barge, and told
4   them that money was still owed for the tug and barge rental.   KULIK
5   and MATSUZAKI agreed to pay the balance owed for the rental, and
6   stated that someone would be in touch with the CS the next day.

7   55.   On January 7, 1997, I spoke with the CS, who informed me
8   that the CS had received a telephone call from AUCHARD that morning,
9   during which AUCHARD asked the CS to meet him (AUCHARD) at a deli in
10  Marina del Rey.

11  56.   On January 7, 1997, I and other DEA agents participated in
12  surveillance of a meeting between the CS and AUCHARD, and spoke with
13  the CS afterward.   Based thereon, I learned that at this meeting,
14  AUCHARD delivered approximately $100,000 (USD) to the CS.   AUCHARD
15  told the CS that AUCHARD needed to travel to another part of the
16  country the next day, on January 8, 1997, to get the rest of the
17  money for the CS, and that the money was likely to be in foreign
18  currency.   Also at this meeting, AUCHARD told the CS that he
19  (AUCHARD) had been in Mexico the day before and had seen the CS and
20  G/S Davis meeting with KULIK and MATSUZAKI, and was curious as to
21  whether the CS had seen AUCHARD.

22  57.   On the morning of January 8, 1997, I listened to a
23  consensually recorded telephone conversation between KULIK and the
24  CS.   In that conversation, KULIK told the CS that KULIK wanted
25  HALPERT to handle distribution of a quantity of hashish which was
26  already present in Montreal.

27  58.   On January 9, 1997, S/A Sclichter and I spoke with the CS,
28  who told us the following:

24

1    a.   On January 8, 1997, the CS traveled to Mexico for a
2  meeting with KULIK.  At this meeting, KULIK introduced the CS to
3  "ROB" (later identified as DOUGLAS SECOR).  KULIK told the CS that
4  SECOR was KULIK's distributor for hashish in the Los Angeles area.
5  SECOR told the CS that he wants to distribute a portion of the 17
6  tons of hashish that was offloaded to G/S Davis in December, 1996
7  which is currently in Los Angeles.
8         (1)  The CS also told me that KULIK told the CS
9  that SECOR was involved with the multi-ton hashish load that was
10 seized in Australia in December, 1996.
11        (2) On January 13, 1997, I spoke with TFO
12 Miller, who told me that on that day, the CS was shown a known
13 photograph of SECOR in a photographic line-up, and the CS positively
14 identified SECOR as the individual with whom he met in Mexico with
15 KULIK on January 8, 1997.
16    b.   The CS spent the night in Mexico, and on January 9,
17 1997, the CS met with KULIK and MATSUZAKI.  During this meeting,
18 KULIK, MATSUZAKI, and the CS spoke about the planned meeting that
19 afternoon between the CS and AUCHARD, during which AUCHARD was to
20 give the CS foreign currency in an amount to equal $90,000 (USD),
21 and about planned deliveries of the hashish in Los Angeles and
22 Montreal.
23    c.   On the afternoon of January 9, 1997, the CS met with
24 AUCHARD at a deli in Marina del Rey.  During this meeting, AUCHARD
25 gave the CS foreign currency equaling approximately $90,000 (USD).
26 AUCHARD told the CS that information about a container of hashish
27 was to be given to AUCHARD about a planned delivery in Los Angeles
28 the next day.  AUCHARD indicated that the CS was to have been told

25

1   of this delivery during prior discussions with "Jerry" (MATSUZAKI).

2   AUCHARD and the CS made arrangements to meet later that afternoon to

3   discuss the proposed delivery in Los Angeles.

4          (1)   AUCHARD telephoned the CS and rescheduled the

5   meeting for the following morning.

6       59.   On January 10, 1997, I spoke with the CS and participated

7   in surveillance of a meeting between the CS and AUCHARD in a parking

8   lot of a hotel near LAX.   The CS told me that during this meeting,

9   AUCHARD gave the CS the address where he wanted a container of

10  hashish delivered.   AUCHARD insisted that the CS provide him with

11  the specifications for the container, such as weight and waybill

12  information.

13          a.   The CS and AUCHARD met again later that day, at which

14  time the CS told AUCHARD that he would not have the container

15  specifications until that evening or the following Monday, January

16  13, 1997, at the earliest.

17      60.   On January 14, 1997, I and other agents participated in

18  surveillance of a meeting between AUCHARD and the CS, and spoke with

19  the CS afterward.   Based thereon, I learned that at this meeting,

20  the CS gave AUCHARD the container specifications.   AUCHARD, in turn,

21  gave the CS a sealed envelope which the CS had previously been

22  instructed by MATSUZAKI to pick up from AUCHARD and bring to

23  MATSUZAKI in Mexico.   AUCHARD also told the CS that AUCHARD was

24  going to travel to Montreal to assist in the distribution of hashish

25  that was presently on its way to Montreal.

26      61.   Based on the foregoing, I believe that probable cause

27  exists to believe that DAVID KULIK, also known as (aka) "JEFFREY",

28  aka COLIN ALLAN WALLS, aka JEFFREY STEIN, aka JOHN ADAMS, aka

26

1  DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL FARRAR, aka DAVID KAULIK,

2  aka DANIEL KULIK, aka DAVID NANDA, aka JEFFREY JAMES, aka JEFFREY

3  COLIN, aka DAVID KUILIK, aka DAVID WILLIAMS, aka DAVID KULICK, aka

4  "SEP", aka DAN WILLS; GARY MATSUZAKI, aka "JERRY"; WANDA MARIE

5  HALPERT, aka "KRIS", aka "ELIZABETH"; DOUGLAS MARTIN SECOR, aka "ROB";

6  and BRIAN ALAN AUCHARD, aka "ROB", aka "BOB", have committed a

7  violation of Title 21, United States Code, Section 846, Conspiracy

8  to Distribute Hashish, a Schedule I Controlled Substance.  I further

9  believe that probable cause exists to believe that DAVID KULIK, also

10  known as (aka) "JEFFREY", aka COLIN ALLAN WALLS, aka JEFFREY STEIN,

11  aka JOHN ADAMS, aka DAVIDNANDA, aka DAVID HOROWITZ, aka DANIEL

12  FARRAR, aka DAVID KAULIK, aka DANIEL KULIK, aka DAVID NANDA, aka

13  JEFFREY JAMES, aka JEFFREY COLIN, aka DAVID KUILIK, aka DAVID

14  WILLIAMS, aka DAVID KULICK, aka "SEP", aka DAN WILLS; BRIAN ALAN

15  AUCHARD, aka "Rob", aka "Bob"; and CHARLES STAUNTON, aka "SAL", aka

16  "CHARLIE", committed a violation of Title 18, United States Codes,

17  Section 1956(h), Conspiracy to Launder Monetary Instruments.

J. Todd Scott
Special Agent
Drug Enforcement Administration

Sworn to and subscribed to before
me on January 15, 1997.

UNITED STATES MAGISTRATE JUDGE

27